# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| ***ex rel.* PATRICIA LESKO AND** | § | |
| **BRAM LESKO,** | § | |
| | § | **CIVIL ACTION NO. 23-13130** |
| **Plaintiff and Relators,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| | § | **FILED UNDER SEAL** |
| **LAFONTAINE MANAGEMENT,** | § | |
| **INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |

## FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL UNDER 31 U.S.C. § 3730(B)(2)

The United States of America *ex rel.* Patricia Lesko and Bram Lesko files this action against Defendant LaFontaine Management, Inc. ("LaFontaine Management"), and in support thereof alleges the following:

## I.  NATURE OF THE ACTION

1.  This action arises out of Defendant's violation of the False Claims Act (the "FCA") by certifying that it was eligible to receive a Paycheck Protection Loan and knowingly concealing those facts in order to receive forgiveness of its obligation to repay that loan. The certification and acts of concealment were material facts relied upon by the Small Business

COMPLAINT                                                                                       1

Administration ("SBA") in approving the loan application and loan forgiveness application.

2.      Defendant is liable for (1) the amount of PPP funds received by LaFontaine Management for which it was ineligible; (2) the amount of loan forgiveness received by LaFontaine Management over and above the amount of the initial loan received; and (3) the loan processing fees paid by the SBA to a Lender for the loan disbursed and forgiven due to the fraudulent conduct alleged herein, as well as for the additional penalties enumerated in the False Claims Act.

## II.   PARTIES

3.      Relator Patricia Lesko is a United States citizen and a resident of Michigan. She brings this action as an original source based upon direct and unique information she has obtained based in part on her experience as an investigative reporter. To her knowledge, the information contained herein has not been publicly disclosed.

4.      Relator Bram Lesko is a United States citizen and a resident of Michigan. He brings this action as an original source based on direct and unique information he has obtained in part due to his experience in working with Defendant, its associated companies, and other automotive groups. To his knowledge, the information contained herein has not been publicly disclosed.

5.     The United States is the real plaintiff in interest with respect to the claims asserted in this matter.  The defrauded loan programs are administered and supervised by the Small Business Administration, an independent, cabinet-level agency of the Federal Government.

6.     Defendant LaFontaine Management, Inc., is a Michigan corporation that was incorporated in 2005 and has its principal place of business at 4000 W. Highland Rd., Highland, Michigan 48357. It may be served through its registered agent, Michael T. LaFontaine Sr., at 4000 W. Highland Rd., Highland, Michigan 48357.

## III.   JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over Defendant as Defendant has adequate minimum contacts with the State of Arizona.

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b), which provide this Court with original jurisdiction to hear a *qui tam* action. Relators are "original sources" and bring this action in the name of the United States as contemplated by the FCA, 31 U.S.C. §§ 3729-33.

9.     Venue is proper in this district because Defendant can be found in, resides in, and/or transacts business in this judicial district. Moreover, acts prohibited by 31 U.S.C.§ 3729 have been committed by Defendants in this

judicial district, making venue proper under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a).

10.     There has been no public disclosure of the "allegations or transactions" in this Complaint, including in any criminal, civil, or administrative hearing, nor in any congressional, administrative or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.  As detailed below, Relators have direct and personal knowledge of such allegations and transactions.  To the extent that any such facts herein become public, Relators voluntarily provided disclosures of these allegations and transactions to the United States pursuant to FCA requirements prior to such public release or knowledge.

## IV.   FACTS

### A. The CARES Act and PPP Loans

11.     The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") is a law intended to address the economic effects of the COVID-19 pandemic in the United States.

12.     The CARES Act led to, among other things, the Paycheck Protection Program ("PPP"). *See* CARES Act, No. 116-136 (March 27, 2020). The PPP is a loan program that was designed to provide eligible small businesses low-interest loans that would be guaranteed by the SBA with support from the

Department of the Treasury.

13.　　The PPP provided small businesses with funds to pay up to 24 weeks of payroll costs, including benefits. While similar in most ways to existing SBA loan programs, the CARES Act suspended the ordinary requirement that borrowers must be unable to obtain credit elsewhere, as defined in the Small Business Act. 15 U.S.C. § 632(h). The PPP section of the CARES Act also expanded eligibility for SBA loans beyond the limitations of the Small Business Act. 15 U.S.C. §§ 632, 636.

14.　　The following entities that were affected by COVID-19 were eligible to apply for PPP funding:

    a. Any small business concern that met SBA's size standards (either the industry-based size standard or the alternative size standard);

    b. Any business, 501(c)(3) non-profit organization, 501(c)(19) veterans organization, or tribal business concern (sec. 31(b)(2)(C) of the Small Business Act) with the greater of:

      i. 500 employees, or

      ii. That meets the SBA industry standard size if more than 500;

    c. Any business with a NAICS code that begins with 72 (Accommodations and Food Services) that has more than one physical location and employs less than 500 per location.

COMPLAINT                                           5

15.     The size of a business concern is determined under the SBA's size standards as they apply to the "concern whose size is at issue and all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).

16.     An entity could also be eligible for a PPP loan as a small business if, 1) as of March 27, 2020, the maximum tangible net worth of the business was not more than $15 million and 2) the average net income of the business after federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of the application was not more than $5 million.

17.     To apply for a PPP loan, entities submitted their First Draw Borrower Application Form to a federally insured depository institution or credit union, or a Farm Credit System, of their choice. That chosen lender processed the applications and, if approved, funded the loans.

18.     The SBA guaranteed 100% of the outstanding balance of these loans, and this guarantee was backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

19.     The SBA also paid processing fees to each lender who funded PPP loans. These processing fees were based on the size of the loan funded. For first draw PPP loans, those fees were: five percent for loans up to $350,000; three percent for loans between $350,000 and $2,000,000; and one percent for loans of at least $2,000,000.

20.     Most loans made under the PPP have been forgiven. As of January 2023, NPR analyzed publicly available data and found that 92% of PPP loans, including loans to companies with wealthy owners, had been forgiven. *See* https://www.npr.org/2023/01/09/1145040599/ppp-loan-forgiveness, last accessed on November 19, 2023.

21.     To be eligible for loan forgiveness, PPP borrowers were required to complete SBA Form 3508, 2508S, or 3508EZ to calculate eligible payroll and nonpayroll costs that qualified to be forgiven. To achieve forgiveness of their loans, borrowers were required to certify that the amount for which forgiveness was requested:

a.  Did not exceed the principal amount of the PPP loan;

b.  Was used to pay business costs that were eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business utility payments; covered operations expenditures; covered property damages costs; covered supplier costs; or covered worker protection expenditures);

c.  Included all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;

d.  Included payroll costs equal to at least 60% of the forgiveness amount; and

e. For any owner-employee with an ownership stake of 5% or more, or any self-employed individual or general partner, did not exceed more than 2.5 months' worth of compensation received during the year used to calculate the loan amount, capped at $20,833 per individual in total across all businesses.

Paycheck Protection Program Loan Forgiveness Application Form 2508, Revised July 30, 2021.

22.    Borrowers were further required to certify that they submitted all required documentation to their Lender, verifying payroll costs, the existence of obligations and service prior to February 15, 2020, and eligible business mortgage interest payments, rent or lease payments, and utility payments. *Id.*

23.    Finally, borrowers were not entitled to forgiveness of a PPP loan unless they certified that all information provided in the loan application, supporting documents, and other forms was true and correct in all material respects. *Id.*

## B. SBA Limitations on Affiliation and Loan Eligibility with Exceptions

24.    To apply for a PPP loan, all applicants were required to submit SBA Form 2483, which required the applicant to indicate "yes" or "no" to the question, "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with any other business? If yes, list all

such businesses and describe the relationship on a separate sheet identified as addendum A." SBA Form 2483, "Paycheck Protection Program Borrower Application Form" (April 2020).

25.     SBA explained that "applicants in SBA's Business Loan Programs (which include the PPP) are subject to the affiliation rule contained in 13 CFR § 121.301." SBA Interim Final Rule "Business Loan Program Temporary Changes; Paycheck Protection Program." 85 Fed. Reg. 20,819 (April 15, 2020).

26.     Under the relevant provisions of the Code of Federal Regulations, entities that have the power to control another are affiliates of one another. Entities that are controlled by the same third party are affiliates of each other and of the third party. 13 CFR § 121.301(f).

27.     Moreover, if a principal of one entity controls the management of another, or if a single individual controls the management or Board of Directors of multiple entities, those entities are affiliates of one another. 13 CFR § 121.301(f)(3).

28.     The CARES Act waived the § 121.301 affiliation provisions for a limited category of business concerns: 1) businesses in the Accommodation and Food Services sector as determined by their North American Industry Classification System (NAICS) code, 2) businesses operating as a franchise that has been assigned a franchise identifier code by the SBA, and 3) businesses

receiving financial assistance from a licensed Small Business Investment Company (SBIC). 15 U.S.C. § 636(a)(36)(D)(iv).

29.    On the PPP Loan Borrower Application Form, the loan applicant must indicate whether or not it is a franchise listed in the SBA's Franchise Directory, although the applicant is not required to list the Franchise Identified Code issued by the SBA on this form. SBA Form 2483, "Paycheck Protection Program Borrower Application Form" (April 2020).

**C. The False Claims Act**

30.    The False Claims Act, or FCA, as set out in 31 U.S.C. § 3729(a)(1), prohibits knowingly presenting, or causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment. Further, as set out in 31 U.S.C. § 3729(a)(2), the FCA prohibits knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to obtain payment or approval for a false or fraudulent claim.

31.    Each violation of the FCA is a violation of federal law that is punishable by three times the amount of the actual damages sustained by the government, as well as a civil penalty of between $13,508 and $27,018 per claim for violations that occurred after November 1, 2015, and for which penalties are assessed after January 30, 2023.

32.     Under the FCA, the term "knowingly" means that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. The FCA does not require proof of a specific intent to defraud.

33.     Defendant's actions, described below, constitute the submission of false and fraudulent claims in violation of the FCA. Defendant submitted a false loan application, improperly received PPP funds, and improperly received forgiveness of its loan.

**B. Defendant's Business and Affiliates**

34.     Defendant is a management company associated with the "LaFontaine Automotive Group," which includes 54 retail franchises, 9 collision centers, and 34 Michigan retail locations (together with Defendant, the "LaFontaine Companies"). Defendant serves as the overall manager of the retail locations and collision centers, handling finances, personnel, and vendor relationships for the other LaFontaine Companies.

35.     Defendant and the other LaFontaine Companies share officers, directors, personnel, and management, and all have the same registered agent. On information and believe, all LaFontaine Companies maintain their financial accounts at The State Bank, and all such accounts are controlled by Defendant.

Defendant maintains financial control over the operations of all other LaFontaine Companies. All LaFontaine Companies are managed by the officers of Defendant, who include Michael LaFontaine, Maureen LaFontaine, and Ryan LaFontaine. Kelley LaFontaine, while not an officer of Defendant, also acts as an executive and manager of the LaFontaine Companies.

36. Due to this common ownership and control, Defendant and the other LaFontaine Companies are affiliates of each other under 13 C.F.R. § 121.301.

37. Under the affiliate rules of the SBA, the LaFontaine Companies do not qualify as a small business enterprise. Together, the companies employ 2600 people and have an annual revenue of over $2 billion. *See* https://www.familydeal.com/about-us/ , last accessed on November 21, 2023.

## C. Defendant Wrongfully Applies for, Receives, and Obtains Forgiveness for a PPP Loan.

38. On April 4 and 5, 2020, 17 of the LaFontaine Companies, including Defendant, were approved for PPP loans through The State Bank. Each loan application listed the same address and the same agent and was signed by the same company representative. Together, the 17 LaFontaine Companies received PPP loans in the amount of $14,635,000, as follows (with Defendant's loan highlighted):

| Borrower Name | Loan Amount | Date Approved | Originating Lender |
|---|---|---|---|
| LAFONTAINE BUICK GMC OF ANN ARBOR INC | $557,500 | 4/4/20 | The State Bank |
| LAFONTAINE CDJR LANSING INC | $847,500 | 4/4/20 | The State Bank |
| LAFONTAINE FORD INC | $664,500 | 4/4/20 | The State Bank |
| LAFONTAINE BUICK GMC INC | $557,500 | 4/5/20 | The State Bank |
| LAFONTAINE CDJR OF FENTON INC | $1,226,500 | 4/4/20 | The State Bank |
| LAFONTAINE FORD OF FRANKENMUTH INC | $588,500 | 4/5/20 | The State Bank |
| LAFONTAINE IMPORT OF FARMINGTON HILLS INC | $588,500 | 4/4/20 | The State Bank |
| LAFONTAINE CADILLAC BUICK GMC INC | $3,129,500 | 4/4/20 | The State Bank |
| LAFONTAINE MOTORS INC | $1,259,000 | 4/5/20 | The State Bank |
| LAFONTAINE MANAGEMENT INC | $1,000,000 | 4/5/20 | The State Bank |
| LAFONTAINE SUBARU INC | $706,000 | 4/5/20 | The State Bank |
| LAFONTAINE VOLKSWAGEN INC | $456,000 | 4/4/20 | The State Bank |
| LAFONTAINE IMPORT MOTORS INC | $672,500 | 4/5/20 | The State Bank |
| LAFONTAINE CHEVROLET INC | $1,025,000 | 4/4/20 | The State Bank |
| LAFONTAINE CDJR OF CLINTON INC | $435,000 | 4/4/20 | The State Bank |
| LAFONTAINE SALINE INC | $712,000 | 4/5/20 | The State Bank |
| LAFONTAINE IMPORTS OF ANN ARBOR INC | $209,500 | 4/5/20 | The State Bank |

COMPLAINT

39.     Of the LaFontaine Companies who obtained PPP loans, sixteen of them are Michigan automotive dealerships that have dealership agreements with the automobile manufacturers for whom they sell cars. Because these automotive manufacturers have franchise identifier codes, those sixteen borrowers were eligible for PPP loans, despite failing to qualify for such loans due to their size, due to the franchise exception under the CARES Act. Such loans therefore appear to have been lawfully obtained.

40.     However, Defendant LaFontaine Management, Inc. does not sell cars and does not operate under a franchise agreement. As such, Defendant did not qualify for PPP funds under any of the applicable small business size standards, including affiliation rules, used by the SBA for purposes of the PPP and did not fall into any available exceptions. Defendant was thus not eligible to receive a PPP loan in the amount of $1,000,000.

41.     As a result of Defendant's fraudulent PPP loan, The State Bank received a 3% loan processing fee from the SBA in the amount of $30,000.

42.     On June 11, 2021, all seventeen PPP loans taken by the LaFontaine Companies were forgiven. Defendant received loan forgiveness in the amount of $1,011,534 – slightly more than the amount it had "borrowed" from the federal government.

COMPLAINT                                                                        14

### D. Relators' Knowledge of the Fraud

43.     Relator Patricia Lesko is an independent investigative journalist who has worked to expose fraud and corruption for over 14 years. In 2020, in the course of writing a data-driven piece for The Ann Arbor Independent, of which she is the editor, Ms. Lesko familiarized herself with PPP loan eligibility requirements and consulted with the president of a local bank to learn about and understand the PPP loan process. She also developed a proprietary dataset combining information about PPP loan application data, NAICS code size standards, and affiliate groupings.

44.     As the result of intensive investigation and the careful review and aggregation of public data from several different sources, Ms. Lesko and her son, Bram Lesko, identified automotive groups as a potential source of PPP loan fraud, and ultimately identified Defendant as an automotive-related company who had fraudulently received, and been forgiven, such a loan.

45.     Relator Bram Lesko works in marketing and class administration at Detroit Training Center and is also a freelance videographer/photographer. Mr. Lesko has recently worked in the automotive sales industry as a photographer and manager for a company called CarData Inc. In that role, Mr. Lesko worked with several dealerships and automotive groups, including the LaFontaine Automotive Group and some of the LaFontaine Companies.

46.     In his business dealings with the LaFontaine Companies, Mr. Lesko became aware that the companies were all managed by the same people, who are officers, directors, executives, or employees of Defendant LaFontaine Management. For example, one LaFontaine Management employee, Courtney, handled the negotiations for a corporate price structure for photography of automobiles for all the LaFontaine retail dealership locations. This experience in working with the LaFontaine Companies, combined with his knowledge of PPP loan fraud from his mother's work and a press release regarding a settlement between the United States Government and another automotive group relating to fraudulent PPP loans, led Mr. Lesko to suggest to his mother that they investigate the loans obtained by the LaFontaine Companies.

47.     Relators now bring this action on behalf of the United States of America to recover the damages caused by Defendant's fraud against the PPP program and the SBA.

## V.     CAUSES OF ACTION

### COUNT I

### FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

48.     The preceding paragraphs are incorporated.

49.     Relator brings this civil action on behalf of the United States of America against Defendants under the False Claims Act, 31 U.S.C. §§ 3729-33.

COMPLAINT                                                                                        16

50.     During the relevant period, Defendant knowingly presented or caused to be presented a materially false or fraudulent claim for payment to the United States, through the Small Business Administration, in violation of 31 U.S.C. § 3729(a)(1)(A).

51.     Defendant did so by knowingly presenting or causing to be presented an application for approval of a PPP loan for which it was ineligible.

52.     Defendant's knowingly false certification on its PPP loan application was material to the government's decision to award it a PPP loan intended for small businesses in the amount of $1 million. When submitting a PPP loan application, an applicant was required to certify that it was eligible, and that all information included in the application form was true and accurate in all material respects.

53.     Defendant had actual knowledge of the falsity of its claims or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

54.     But for Defendant's submission of its false claim, the SBA would not have approved the loan or paid the Lender the processing fee for the loan application.

55.     The United States suffered damages because of the false claim that Defendant made or caused to be made and is entitled to recover its losses of

approximately $1,030,000, and to obtain other relief available under the FCA, including treble damages and civil penalties.

## COUNT II

### FALSE CLAIMS ACT – CREATING A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE CLAIM

56.     The preceding paragraphs are incorporated.

57.     Defendant knowingly made or caused to be made false records or statements to support a false claim submitted to the SBA in violation of 31 U.S.C. § 3729(a)(1)(B).

58.     Defendant's creation of a knowingly false loan application supported The State Bank's claim to the SBA for a loan processing fee for a loan that was falsely or fraudulently obtained by Defendant.

59.     Defendants had actual knowledge of the falsity of these records and statements or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

60.     The United States suffered damages because of the false records and statements that Defendants made, used, and caused to be made and used, and is entitled to recover its losses in the amount of $30,000, and to obtain other relief available under the FCA, including treble damages and civil penalties.

## COUNT III

## FALSE CLAIMS ACT – IMPROPER AVOIDANCE OF OBLIGATION TO GOVERNMENT

61.     The preceding paragraphs are incorporated.

62.     Defendant knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. § 3729(a)(1)(G).

63.     Defendant did so by falsely certifying compliance with the PPP program in applying for forgiveness of its PPP loan, by falsely concealing its affiliation with the other LaFontaine Companies, and by failing to repay the PPP loan it received..

64.     But for Defendant's concealment, the SBA would not have forgiven Defendant's obligation to repay the PPP loan, including interest.

65.     The United States suffered damages because of these misrepresentations and is entitled to recover its losses in the amount of $1,011,534, and to obtain other relief available under the FCA, including treble damages and civil penalties.

### VI.   JURY DEMAND

66.     Relators respectfully demand a trial by jury.

### VII.  PRAYER

67.     Relators respectfully request the following relief:

COMPLAINT                                                                                           19

(a) That judgment be entered in favor of the United States and Relators and against Defendant in the amount of all damages sustained because of Defendant's actions, multiplied by three as provided by 31 U.S.C. § 3729(a), plus a civil penalty for each and every such claim in the amount of between $13,508 and $27,018 per claim;

(b) That Relators be awarded the maximum amount permissible under 31 U.S.C. § 3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

(c) That, pursuant to 31 U.S.C. § 3730(c)(5), Relators be awarded a share of any alternate remedy that the United States elects to pursue;

(d) That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

(e) That the United States and Relators be awarded prejudgment and post-judgment interest; and

(f) That the United States and Relators receive all such other and further relief, at law or in equity, to which they show themselves to be justly entitled.

COMPLAINT                                                                          20

DATED:  December 8, 2023

Respectfully submitted,

/s/ Elizabeth K. Stepp
Elizabeth K. Stepp
Texas Bar No. 00788467
eks@federal-lawyer.com
Nick Oberheiden
NY Reg. No. 4679011
nick@federal-lawyer.com
**OBERHEIDEN P.C.**
440 Louisiana St., Suite 200
Houston, Texas 77002
(214) 334-7648 (Telephone)
(972) 559-3365 (Facsimile)
**ATTORNEYS FOR RELATOR**

COMPLAINT                                                                           21